10 N.Y.3d 875 (2008)
890 N.E.2d 877
860 N.Y.S.2d 762
THE PEOPLE OF THE STATE OF NEW YORK, Respondent,
v.
FATIN JOHNSON, Appellant.
Court of Appeals of the State of New York.
Argued April 24, 2008.
Decided June 3, 2008.
*876 Center for Appellate Litigation, New York City (Laura Burde and Robert S. Dean of counsel), for appellant.
Robert M. Morgenthau, District Attorney, New York City (Susan Gliner and Mark Dwyer of counsel), for respondent.
Mayer Brown, LLP, New York City (Andrew H. Schapiro of counsel), Barry C. Scheck, Peter J. Neufeld, David Loftis and Ezekiel R. Edwards for Innocence Project, amicus curiae.
Lorca Morello, New York City, Steven Banks, Richard Willstatter, White Plains, and Alfred O'Connor, Albany, for Legal Aid Society and others, amici curiae.
Chief Judge KAYE and Judges CIPARICK, GRAFFEO, READ, SMITH, PIGOTT and JONES concur in memorandum.

OPINION OF THE COURT
MEMORANDUM.
The order of the Appellate Division should be reversed and the case remitted to that Court for further proceedings in accordance with this memorandum.
Late in the afternoon of July 2, 1998, on the corner of 102nd Street and First Avenue in New York City, defendant Fatin Johnson and his older brother Amir got into a heated argument over money that defendant claimed Amir owed him. Amir advanced toward defendant, who threw down the bicycle that he had been straddling, and drew a revolver from his waistband. At the sight of the gun, Amir started to run east in the direction of FDR Drive. Defendant gave chase a little way and then fired a single shot, which hit Amir in the back at a distance of about 30 feet. The bullet pierced Amir's left lung and heart. As he slid to the ground, fatally wounded, Amir heaved a knife in defendant's direction, which landed harmlessly on the sidewalk. After discharging his weapon, defendant strode back to his bicycle, hopped on and rode off.
We know what happened largely from the account of two eyewitnesses: a resident of a nearby building and a maintenance man in the same building. The resident was "dusting" off his car, which was parked on 102nd Street just east of First Avenue, while his two children, aged three and eight, played on the sidewalk close by. He was waiting for his wife to come downstairs with their other child, as the family *877 planned to take an automobile trip away from the City for the Fourth of July holiday. The resident was about 10 or 12 feet away from defendant and Amir, who stood on the corner smoking "joints" and talking for perhaps 15 minutes before the violence erupted. When the resident saw defendant draw the revolver, he pleaded "do not shoot, do not shoot," because "[his] kids [were] there. The bullet passed on top of [his] kids."
The maintenance man was leaving the building to go home, having finished work for the day. Hearing "screaming . . . at the end of the block" and "loud argument," he walked to the corner "to see what was going on." He watched the altercation for about 10 minutes, standing 5 or 6 feet away from defendant and Amir.
Defendant was subsequently indicted and tried for intentional and depraved indifference murder (Penal Law § 125.25 [1], [2]); second-degree criminal possession of a weapon (possession of a loaded firearm with intent to use unlawfully against another) (Penal Law § 265.03); and third-degree criminal possession of a weapon (possession of a loaded firearm except in one's home or place of business) (Penal Law § 265.02). The two eyewitnesses, who had earlier picked out defendant in a court-ordered lineup, identified him as the shooter at trial.
On April 28, 2004, the jury acquitted defendant of intentional murder and second-degree criminal possession of a weapon, and convicted him of depraved indifference murder and third-degree criminal possession of a weapon. On May 18, 2004, the trial judge sentenced defendant to concurrent prison terms of 25 years to life and seven years respectively for the two crimes of which he was convicted.
The Appellate Division affirmed, with two Justices dissenting. On appeal, defendant's "principal claim" was "a two-fold challenge to the sufficiency and weight of the evidence supporting the verdict convicting him of depraved indifference murder," which the majority rejected (People v Johnson, 43 AD3d 288, 289 [1st Dept 2007]). The majority also rejected defendant's other contentions, specifically concluding that he was "not entitled to suppression of identification evidence on the ground that the court denied his application for court-ordered lineups to be conducted in a sequential and double-blind fashion" (id. at 293).
The dissenters favored exercising interest of justice jurisdiction to find that the verdict in this case was not supported by *878 legally sufficient evidence. They further concluded that the verdict was against the weight of the evidence. Accordingly, the dissenters would have reduced defendant's murder conviction to second-degree manslaughter. The dissenters agreed with the majority, however, that defendant's other contentions were "unconvincing and would not merit a reversal" (id. at 297). One of the dissenting Justices subsequently granted defendant leave to appeal to us.
In People v Danielson (9 NY3d 342 [2007]), a case decided after the Appellate Division's decision here, we explored the requisites for sufficiency and weight of the evidence review. As we explained, while these examinations overlap to some degree, they call for independent analyses. Here, the court considered the credibility of witnesses (the two eyewitnesses and defendant's ex-girlfriend, who testified at trial that defendant told her on July 2, 1998 that he "might have killed [his] brother"), as is essential for a weight of the evidence review. But having chosen to manifest its weight of the evidence review power in a writing, the Appellate Division does not say that it assessed the evidence in light of the elements of the crime as charged to the jury, and the opinion does not otherwise offer confirmation that, in fact, it did (see People v Bleakley, 69 NY2d 490 [1987]; People v Romero, 7 NY3d 633 [2006]). Accordingly, here, as in People v Pasley (the companion case to Danielson), we remit to the Appellate Division so that it may make such an assessment.
Finally, we express no opinion as to whether the trial judge possessed discretion to impose the conditions on the lineup requested by defendant. Assuming that the trial judge was authorized to do this, she did not abuse her discretion when she denied defendant's application: she expressed familiarity with lower court decisions and studies addressing the pro's and con's of various lineup procedures, and decided that the conventional simultaneous lineup requested by the People was warranted.
Order reversed, etc.